UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHALANA SATTERWHITE, | ) | Case No.: 1:17 CV 1273 |
| Plaintiff | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| CLEVELAND METROPOLITAN SCHOOL DISTRICT, | ) | |
| Defendant | ) | ORDER |

Currently pending before the court in the above-captioned case is Defendant Cleveland Metropolitan School District's ("CMSD" or "Defendant") Motion to Dismiss (ECF No. 4) Counts Two and Four of the Complaint for failure to state a claim upon which relief can be granted. For the following reasons, Defendant's Motion to Dismiss is denied.

## I. BACKGROUND

On June 16, 2017, Plaintiff Shalana Satterwhite ("Plaintiff") commenced this civil action against Defendant, alleging claims of retaliation and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. ("Title VII"), as well as supplemental Ohio state law contract and tort claims. (Compl., ECF No. 1.) On September 1, 2017, Defendant filed its Motion to Dismiss (ECF No. 4) Counts Two and Four of the Complaint, alleging Title VII gender discrimination and intentional infliction of emotional distress, respectively.

Since in or about May 2014, Plaintiff, a female, has been employed by Defendant as a Mobile Deputy/Police Officer. (*Id*. ¶¶ 12, 14.) In or about June 2015, Plaintiff filed a Charge of Discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC"),

Charge No. 532-2015-01987 ("EEOC Charge"), alleging certain violations of Title VII. (*Id.* ¶ 15.) In December 2015, that EEOC Charge against Defendant was settled in mediation facilitated by the EEOC ("EEOC Charge Settlement"). (*Id.* ¶ 16.)

According to Plaintiff, following the settlement of the EEOC Charge, Plaintiff was subjected to a number of materially adverse employment actions by Defendant in retaliation for her filing the EEOC Charge, a protected activity within the meaning of 42 U.S.C. § 2000e-3(a). (*Id.* ¶ 18.) In January 2016, Plaintiff's supervisors and peers began to engage in a purposeful campaign of harassment intended to punish Plaintiff for filing the EEOC Charge. (*Id.* ¶ 20.) Sergeant Jacomdamius Lee was encouraged by other CMSD Safety and Security Department ("Security Department") supervisors to "let her fail" as punishment for her filing the EEOC Charge and with the intention of "forc[ing] her out of her job." (*Id.* ¶ 21.) Sergeant Lee also instructed Lieutenant Terry Wheeler to avoid providing certain law enforcement training to Plaintiff, including taking her out on patrol. (*Id.* ¶ 22.) Plaintiff was assigned on a full-time basis to security duty positions that were normally rotated through by all Security Department police officers because they were positions that did not require a fully qualified law enforcement officer and, as such, did not provide any career advancement or training opportunities. (*Id.* ¶ 23.)

On or about January 19, 2016, Plaintiff was asked to attend a meeting with her superiors after roll call where she was reprimanded for "asking too many questions." During that meeting, her supervisors also allegedly asked Plaintiff whether they would need to use "kid gloves" in order to deal with her, to which Plaintiff responded that she wanted to be treated equally. (*Id.* ¶ 24.) Also in January 2016, Plaintiff's supervisors encouraged an environment wherein Plaintiff's male peers were permitted to isolate and mock Plaintiff without discipline, including by making repeated statements

that she should "just quit." (*Id*. ¶ 25.) Other officers within the Security Department also were permitted to circulate a petition for signature that called Plaintiff out by name and criticized her for the duties she was assigned to as a result of the EEOC Charge Settlement terms CMSD agreed to with Plaintiff. (*Id*. ¶ 27.) On or about January 27, 2016, Officer Martin Carrion spoke with Sergeant Kevin Oliver, accusing Plaintiff of failing to respond to a dispatch call at James Fords Rhodes School. Although that accusation was false, as supported by taped radio calls, Officer Carrion was never disciplined for the false accusation. (*Id*. ¶ 26.)

On February 1, 2016, Plaintiff filed an internal complaint for "harassment/retaliation/hostile work environment" against the Security Department as a direct result of the various actions that had been taken against her at work in the month following the EEOC Charge Settlement. (*Id*. ¶ 28.) On February 2, 2016, just one day later, Plaintiff's supervisors selectively targeted Plaintiff in order to impose discipline that was not in accordance with the Security Department's normal policy for enforcement when they uncovered student-confiscated "brass knuckles" in her locked patrol car at the end of the day. (Id. ¶ 29.) Sergeant Oliver alleged that the brass knuckles should have been immediately logged into evidence in accordance with Security Department policy and, in front of Sergeant Lee, instructed Officer Lynn Wyatt to research possible criminal charges that could be brought against Plaintiff in connection with the incident. (*Id*. ¶¶ 30-31.) This directive apparently came from Lieutenant Wheeler, even though, both before and after the brass knuckle incident, other Security Department officers, including Sergeant Oliver, had routinely left major evidence, including drugs, in patrol cars or out on desks without logging them into evidence immediately and without facing any disciplinary actions. (*Id*. ¶¶ 31-32.)

On April 7, 2016, CMSD issued a "written reprimand" signed by Chief Lester Fultz in

connection with the brass knuckles incident, stating that Plaintiff was been "found in violation of the Rules and Regulations of the Safety and Security Department." (*Id*. ¶ 33.) The reprimand included a finding of "improper conduct" and also included a notation that it would be placed in Plaintiff's personnel file and could be used as a factor in calculating future disciplinary actions against her. (*Id*.) This reprimand was issued even though, during the time period between the February 2, 2016 brass knuckle incident and the April 7, 2016 reprimand, multiple complaints were made to Security Department supervisors about policy violations by other male officers, including failing to log evidence, without those complaints resulting in the type of disciplinary action taken against Plaintiff. (*Id*. ¶¶ 34-35.)

Also in April 2016, Lieutenant Wheeler, with Chief Fultz's knowledge, assigned Plaintiff to a new patrol region in violation of the terms of the EEOC Charge Settlement. (*Id*. ¶ 36.) Lieutenant Wheeler also gave an order that Plaintiff was not allowed to ride in the same patrol car with another female, Plaintiff's former partner, Officer Lynn Wyatt, even though there existed no formal or informal Security Department policy that prevented two qualified female officers from riding together, and even though two male officers were still permitted to ride together. (*Id*. ¶ 37.) Plaintiff alleges that Lieutenant Wheeler issued this order because of Plaintiff's gender and that he told other supervisors that the reason for the order was because he did not want the two women talking to each other. (*Id*. ¶ 38.) On or about April 27, 2016, Plaintiff filed a union grievance against CMSD in connection with her assignment to a new patrol region. (*Id*. ¶ 39.) On or about April 28, 2016, Plaintiff also filed an internal complaint for unfair gender treatment, discriminatory harassment, and retaliation. (*Id*. ¶ 40.)

On May 9, 2016, after a Two-Step union grievance hearing resulted in a decision in

4

Plaintiff's favor, Chief Fultz, who was in attendance, became angry, stood up, and said to Plaintiff, "Is there anything else you want[,] Satterwhite? Is this over? Can I go?" before leaving the room. (*Id*. ¶ 41.) On August 1, 2016, an investigator for CMSD issued Plaintiff a letter with the results of the investigation and interviews in connection with Plaintiff's internal complaint. (*Id*. ¶ 42.) The letter stated that there was "no evidence" to substantiate Plaintiff's claims, and further stated that the investigation did not uncover "any evidence" that CMSD's Policy Prohibiting Sexual Harassment and Discrimination and Title IX Grievance Procedures had been violated and that the file was closed. (*Id*. ¶ 42.) The letter stated there was "no evidence," even though, following Plaintiff's April 28, 2016 complaint, several officers provided testimony to CMSD's investigator consistent with Plaintiff's Complaint in this action. (*Id*. ¶ 43.) Even after the closure of Plaintiff's internal complaint file, gender-based harassment and retaliatory actions continued through March 2017, creating an unsafe and hostile work environment for Plaintiff, including where male officers would tell Plaintiff that they would not provide back up to her on dispatch calls and where Plaintiff was subjected to disparate scrutiny of her every action. (*Id*. ¶ 44.) Plaintiff alleges this was done with the intent to inundate her personnel file to help push her out of the Security Department and tarnish her record as a police officer. (*Id*.)

On March 6, 2017, Plaintiff feared that the hostile environment at the Security Department had grown too risky and so she was forced to resign her position citing "ongoing harassment [and] safety issues within my Department." (*Id*. ¶ 45.) Plaintiff secured a new position as a police officer at Lakewood Community College. (*Id*.) Plaintiff considered returning to the Security Department in order to prevent it from "getting away with its retaliation against her," however she was told that Chief Fultz stated to a union representative that he would not hire Plaintiff back because he viewed

5

her as "trouble." (*Id.* ¶ 46.) In spite of her resignation from the Security Department, the harassment from CMSD continued into her new position at Lakewood Community College. On May 19, 2017, the same investigator who handled her internal complaint at CMSD and said there was "no evidence" to support Plaintiff's claims, sent a lawful public records request to Plaintiff's new employer requesting her personnel file, but also requested information on Plaintiff's "separation from service with the College, if any[,…] and any electronic or other written communications related to her employment or discharge [and…m]y understanding is that Officer Satterwhite may have only been employed with the College for a short time[.]" (*Id.* ¶ 48.) This request was sent even though Plaintiff was never discharged from her at-will position at Lakewood Community College and currently works rotating shifts for that employer. (*Id.* ¶ 49.) As a result of the request, Plaintiff was confronted by her new supervisors at Lakewood Community College Police Department about why they had received the request, which caused Plaintiff "intense anxiety and emotional distress." (*Id.* ¶ 50.) Subsequent to all of the foregoing events, Plaintiff sought psychological treatment for what has since been diagnosed as emotional distress in connection with her time working for Defendant. (*Id.* ¶ 51.)

## II. LAW AND ANALYSIS

The court examines the legal sufficiency of Plaintiff's claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Mayer v. Mulod*, 988 F.2d 635, 638 (6th Cir. 1993). The United States Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and in *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949–50 (2009), clarified the law regarding what a plaintiff must plead in order to survive a motion made pursuant to Rule 12(b)(6).

When determining whether the plaintiff has stated a claim upon which relief can be granted, the court must construe the complaint in the light most favorable to the plaintiff, accept all factual

6

allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The plaintiff's obligation to provide the grounds for relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The Court, in *Iqbal,* further explained the "plausibility" requirement, stating that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678. Furthermore, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully." *Id.* This determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

### A. Title VII Gender Discrimination (Count Two)

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer…to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has made clear that, while a "mere utterance of an…epithet which engenders offensive feelings in a[n] employee does not sufficiently affect the conditions of employment to implicate Title VII," the Act is violated "when the workplace

7

is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted). Moreover, it is also clear that Title VII comes into play before the harassing conduct leads to a nervous breakdown. *Id.* Thus, even an abusive work environment that does not seriously affect employees' psychological well-being "can[,] and often will[,] detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Id.* at 370-71. Further, while some more pervasive cases "merely present some especially egregious examples of harassment[,] [t]hey do not mark the boundary of what is actionable."

Contrary to Defendant's characterization of *Keys v. Humana, Inc.*, 694 F.3d 605, 610 (6th Cir. 2012) and *Sam Han v. University of Dayton*, 541 F. App'x 622, 627 (6th Cir. 2013), Plaintiff's Complaint states a plausible claim of gender discrimination under Title VII. Like in *Keys*, and unlike in *Han*, Plaintiff's Complaint details several specific events (*e.g.*, the "brass knuckles" incident, the full-time assignment to a non-law enforcement position that did not provide career advancement or training opportunities, the inability to ride with another female officer, etc.) in various employment-action categories (*e.g.*, discipline, promotion) where Plaintiff alleges that she was treated differently than her male counterparts at the Security Department (*Id.* ¶¶ 23, 29-35, 37-38) ; it identifies the key supervisors and other relevant persons by gender as well as by name and position (*e.g.*, Chief Fultz, Lieutenants Lee and Wheeler, and Officer Oliver) (*Id.* ¶¶ 21-22, 26, 30); and it alleges that Plaintiff received these adverse employment actions notwithstanding her being a fully qualified Mobile Deputy/Police Officer. (*Id.* ¶ 13.) Plaintiff further alleges that as a direct result of Defendant's conduct, she was forced to resign her position. (*Id.* ¶ 45.) Plaintiff also alleges that even after her

8

resignation, Defendant engaged in specific conduct which endangered her employment position with her new employer. (*Id.* ¶¶ 48-50.)

Moreover, under the totality of the circumstances test laid out in *Harris*, Plaintiff's Complaint also sufficiently alleges conduct at the Security Department, which created an unsafe and hostile working environment by alleging that there was a continuous period of time in which other male officers specifically told Plaintiff that they would not provide her with back-up on dispatch calls. 510 U.S. at 22-23; Compl. ¶ 44. This allegation is particularly egregious when one considers the inherently dangerous nature of law enforcement activities. Finally, Plaintiff has alleged that she was actually psychologically affected by indicating that, as a result of the events laid out in her Complaint, she sought psychological treatment and was subsequently diagnosed with emotional distress. *Harris*, 510 U.S. at 22 (explaining that "certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct[,] so long as the environment would reasonably be perceived, and is perceived, as hostile or abusive.")

That Defendant may have some defense or explanation for some of its conduct–for example, an attempt to maximize coverage of the few female officers in the Security Department–does not negate that the practice facially, and quite plausibly, supports Plaintiff's claim of gender discrimination. Defendant's citation of *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008) as an example of what is required to show a hostile work environment under Title VII is also unavailing. Nothing within Title VII, or applicable case law, suggests that a plaintiff may only plead a plausible claim of gender or sex discrimination if it is based on underlying conduct that amounts to sexual harassment. Unfortunately, there are a number of ways in which an individual may be discriminated against in a workplace environment on the basis of their gender, and Title VII is

9

intended to "'strike at the entire spectrum of disparate treatment of men and woman' in employment." *Harris*, 510 U.S. at 21. Accordingly, Defendant's Motion to Dismiss Plaintiff's Title VII gender discrimination claim is denied.

### B. Intentional Infliction of Emotional Distress (Count Four)

Under Ohio law, to state a claim for intentional infliction of emotional distress, a plaintiff must demonstrate that: "(1) the defendant intended to cause emotional distress, or knew or should have known that his conduct would result in serious emotional distress to the plaintiff; (2) the defendant's conduct was outrageous and extreme beyond all bounds of decency and subsequently can be characterized as utterly intolerable in a civilized community; (3) the defendant's conduct was the proximate cause of plaintiff's psychic injuries; and (4) the plaintiff's emotional distress was serious, and of such a nature that no reasonable person could be expected to endure it." *Ehrlich v. Kovack*, 15 F. Supp. 3d 638, 677 (N.D. Ohio 2015) (citing *Bolander v. BP Oil Co.*, 128 F. App'x 412, 419 (6th Cir. 2005)). The Ohio Supreme Court has explained that, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Ehrlich*, 15 F. Supp. 3d at 678, (citing *Yeager v. Local Union 20*, 45 N.E. 2d 666, 671 (Ohio 1983)). Thus, [t]o say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement." *Id.* (citing *Baab v. AMR Servs. Corp*., 811 F. Supp. 1246, 1269 (N.D. Ohio 1993)).

Plaintiff's Complaint alleges a series of intentionally retaliatory conduct that was meant to create such an intolerably hostile work environment that she would "just quit." Plaintiff also alleges that as a result of Defendant's conduct, she sought psychological treatment and was subsequently

10

diagnosed with emotional distress. It is true that, at the summary judgment stage, some Ohio courts have found allegations of retaliatory and harassing conduct similar to that alleged in Plaintiff's Complaint not to be sufficient to state a claim for intentional infliction of emotional distress. *Shepard v. Griffin Services Inc.*, Case No. 19032, 2002 WL 940110 (Ohio Ct. App. May 10, 2002) at *15 (affirming a grant of summary judgment against plaintiff); *Smith v. Lebanon City Sch.*, Case No. CA99-02-024, 1999 WL 1016185, at *8 (Ohio Ct. App. Nov. 8, 1999) (same); *See v. Cleveland Clinic Found.*, 222 F. Supp. 3d 569, 577 (N.D. Ohio 2016) (finding, at the summary judgment stage, that the plaintiff's claim failed as a matter of law). It is also true that "plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." *See*, 222 F. Supp. 3d at 577. However, society cannot yet be said to be so depraved as to prevent a person of reasonable sensibilities from exclaiming, "Outrageous!" at Plaintiff's description of Defendant encouraging an environment whereby fellow male law enforcement officers affirmatively stated their intention not to back up a fellow law enforcement officer on dispatch calls as a consequence for her exercising her statutorily protected rights. *Id*. at 578. Defendant's conduct was then exacerbated by the fact that, after it had gotten what it wanted (i.e., Plaintiff's resignation for fear for her safety), it went even further and attempted to sabotage Plaintiff's efforts to succeed as a law enforcement officer elsewhere. *Ehrlich*, 135 F. Supp. 3d at 678 (denying motion for judgment on the pleadings where plaintiff alleged more than just the loss of her employment as a result of the defendant's conduct in retaliation for her exercising her constitutional rights). Accordingly, although Plaintiff ultimately has an exceedingly high bar to meet, at this stage in the litigation, the court finds that Defendant is not entitled to judgment in its favor with respect to Plaintiff's claim of intentional infliction of emotional distress.

11

### III.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (ECF No. 4) Counts Two and Four of the Complaint is denied.

IT IS SO ORDERED.

/s/ <u>*SOLOMON OLIVER, JR.*</u><br>UNITED STATES DISTRICT JUDGE

December 11, 2017